**Mitch PAULSEN, Andrew Nesselroth, Mike Plunkett, and John DeRienzo, Plaintiffs–Appellees,**

v.

**COUNTY OF NASSAU, Nassau County Veterans Memorial Coliseum and Facility Management of New York, Inc., Defendants–Appellants.**

**No. 821, Docket 90–7675.**

United States Court of Appeals, Second Circuit.

Argued Jan. 11, 1991.

Decided Feb. 4, 1991.

Kevin J. McGill, Clifton, Budd & DeMaria, New York City, for plaintiffs-appellees.

Lonnie K. Seide, Freedman, Weisbein, Samuelson & Rieger, P.C., Garden City, N.Y. (Eugene L. Weisbein, Robert S. Weisbein, of counsel), for defendants-appellants.

Before KAUFMAN, NEWMAN, and McLAUGHLIN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

From the time of the founding of our nation, the distribution of written material has been an essential weapon in the defense of liberty. Throughout the years, the leaflet has retained its vitality as an effective and inexpensive means of disseminating religious and political thought. Today, when selective access to channels of mass communication limits the expression of diverse opinion, the handbill remains important to the promise of full and free discussion of public issues. For those of

moderate means, but deep conviction, freedom to circulate fliers implicates fundamental liberties.

This is not to say that the right to dispense literature is not without some restrictions. In recent years, the latitude given to expressive liberty has been increasingly circumscribed by efforts to characterize euphemistically the situs on which the communication is to take place. To illustrate, we have been informed that if the premises constitute a public forum, whether by tradition or by government designation, expression may be abridged only for compelling purposes. Where, however, the First Amendment activity is incompatible with the principal function of the premises, and where the government did not intend to open the facility to the public generally, reasonable regulations are appropriate.

In this dispute, the District Court for the Eastern District of New York decided that the Nassau County Veterans Memorial Coliseum (the "Coliseum") had been designated by the County as a public forum. Accordingly, Judge Mishler held that leafletting may be restricted only through neutral time, place and manner regulations or by content-based prohibitions narrowly drawn to effectuate a significant state interest. *See Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). Based on these principles, the court granted a preliminary injunction requiring appellants to permit the distribution of noncommercial literature on the Coliseum grounds, subject to reasonable conditions to ensure public safety and to cover costs.

We believe the court's decision was adequately supported by the record. We affirm.

## BACKGROUND

A brief overview of the Coliseum's history and physical design provides the relevant background to our analysis. The Nassau Coliseum is a large, county-owned compound located on fifty-four acres of property in Uniondale, New York. Following the completion of construction in 1972, Nassau County commenced operations and managed the stadium until 1979, when it entered into a long-term lease with Hyatt Management. In 1988, after Hyatt changed its name to Facility Management of New York ("Facility Management"), it merged with Spectacor Management and replaced supervising personnel.

The Coliseum arena, an enclosed elliptical structure with a capacity of 18,000 seats, is surrounded by a network of sidewalks, pedestrian thoroughfares and numerous parking lots which can accommodate several thousand automobiles. The stadium serves as home to a National Hockey League club and provides a venue for a wide variety of commercial and charitable events. In addition, a 60,000 square foot underground exhibition hall hosts an assortment of trade shows.

The present dispute began on July 30, 1988 when Mitch Paulsen and Andrew Nesselroth, members of the Christian Joy Fellowship organization, an evangelical group devoted to encouraging bible study, distributed religious leaflets to Coliseum patrons attending a "Judas Priest" rock concert. Paulsen was resting from his activities, when a Nassau County police officer informed him that he was not permitted to distribute the handbills and demanded he leave the premises. After Paulsen protested, the officer forcibly placed him in a patrol car and confiscated the leaflets he carried.

Paulsen was then taken to the Coliseum command trailer where the officers reviewed his arrest record. Lieutenant Robert Turk then informed him that if he wished to continue dispensing handbills, he needed the permission of Lance Elder, Nassau Coliseum Director of Operations. Elder advised him later that a local ordinance prohibited the distribution of material on Coliseum sidewalks. Appellees were not charged with violating any law and were informed they could retrieve their leaflets from the police following the concert.

During a two day evidentiary hearing before Judge Mishler on the motion for a preliminary injunction, brought pursuant to 42 U.S.C. § 1983, Paulsen revealed his *mo-*

*dus operandi.* He testified that on at least fifteen previous occasions, he and his associates had circulated more than 100,000 handbills at the Coliseum. On average, between six and ten individuals would stand in the mall area for approximately two hours before a scheduled event to distribute their fliers to incoming patrons.

The Christian Joy Fellowship specifically targeted heavy metal and rock concert fans because the Fellowship was convinced that the young people who attended these events required more spiritual guidance. Paulsen specified several such occasions during which Coliseum employees or police officers affirmatively consented to these activities. Nesselroth's testimony concurred substantially with Paulsen's account.

Facility Management and Nassau County vigorously contested appellees' version of events. They claimed that for the past several years the Coliseum management consistently has forbidden all noncommercial leafletting. When Coliseum employees or the police have discovered groups soliciting donations or distributing literature, appellants contended, the offending parties were advised of stadium policy and requested to cease their activities.

Following the hearing, Judge Mishler granted Paulsen and Nesselroth's motion for preliminary injunctive relief, finding a serious likelihood that their First and Fourteenth Amendment rights to engage in expressive activity had been violated. He directed appellants to issue a permit allowing the distribution of noncommercial literature on that portion of the property located outside the arena, subject to reasonable regulations related to community safety and necessary expenses.

## DISCUSSION

■ Under our well-established standard for the granting of preliminary injunctive relief, a moving party must demonstrate: it will suffer irreparable harm and either a likelihood of success on the merits or a sufficiently serious question that raises a fair ground for litigation, with the balance of hardships tipping decidedly in its favor.

*Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990). Our review is limited to determining whether the district court abused its discretion in granting the motion.

■ Initially, we note that improper conduct for which monetary remedies cannot provide adequate compensation suffices to establish irreparable harm. *Jackson Dairy, Inc. v. H.P. Hoods & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam). Specifically, our historical commitment to expressive liberties dictates that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976). Since prohibitions on leafletting and dissemination of religious views contravene core First Amendment values, *see, e.g., United States v. Grace,* 461 U.S. 171, 176, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983), appellees have satisfied the initial requirement for securing injunctive relief.

Accordingly, we turn our attention to another prerequisite for securing injunctive relief: establishing a likelihood of success on the merits. Resolution of this issue depends on a determination whether appellants violated the First Amendment by completely excluding noncommercial leafletting from the Coliseum grounds. Central to this inquiry will be the nature of the county property on which the expression at issue occurred. Before passing on whether Paulsen and Nesselroth are likely to prevail in pursuing their claims, however, we pause to consider the public forum doctrine.

### A. The Public Forum Doctrine

Government-owned property has been divided into three categories for purposes of forum analysis: (1) *traditional public forums,* which "by long tradition or by government fiat have been devoted to assembly and debate," *Perry Education Assn.,* 460 U.S. at 45, 103 S.Ct. at 954, including such areas as public streets, parks and sidewalks; (2) *public forums by*

*government designation* that are state-created and opened for limited public use, for example, university meeting facilities and municipal theatres; and (3) *nonpublic forums* which, by tradition or design, are not appropriate platforms for unrestrained communication—military installations and federal workplaces, for instance, fall into this category. *Id.*

■ Analysis of First Amendment rights reveals the relevancy of forum classification. Quintessential public forums may be regulated only via content-neutral time, place and manner restrictions. In rare instances, narrowly drawn content-based exclusions that are necessary to serve a compelling state interest are acceptable. *See Frisby v. Schultz,* 487 U.S. 474, 480–81, 108 S.Ct. 2495, 2499–2500, 101 L.Ed.2d 420 (1988).

■ These same standards govern the regulation of the category which deals with the public forum by government designation. Though the state may limit access to certain speakers or subjects, ordinances must be applied even handedly to all similarly situated parties. *Perry,* 460 U.S. at 48, 103 S.Ct. at 956.

■ It is in the nonpublic forum, however, where the state has maximum control over communicative behavior since its actions are most analogous to that of a private owner. Restrictions are held to a less strict reasonableness standard. *Id.* at 46, 103 S.Ct. at 955; *see Greer v. Spock,* 424 U.S. 828, 836, 96 S.Ct. 1211, 1216, 47 L.Ed.2d 505 (1976). It is sufficient that rules reflect a legitimate government concern and do not suppress expression merely because public officials oppose the speaker's view.

With these principles in mind, we consider the proper classification of Nassau Coliseum. Since Paulsen and Nesselroth seek access only to the sidewalk and mall areas outside the arena itself, the issue is presented to us in a context where First Amendment protection is greater.

### B. Application of the Public Forum Doctrine to the Nassau Coliseum

■ Nassau County's intent in establishing and maintaining the Coliseum is the touchstone for determining whether a public forum has been created. *Stewart v. District of Columbia Armory Board,* 863 F.2d 1013, 1016 (D.C.Cir.1988). Appellant's bare assertion that Nassau County did not mean to permit noncommercial speech on Coliseum grounds is not conclusive. Intent is not merely a matter of stated purpose. Indeed, it must be inferred from a number of objective factors, including: appellants' policy and past practice, as well as the nature of the property and its compatibility with expressive activity. *Cornelius v. NAACP Legal Defense and Educ. Fund,* 473 U.S. 788, 802–03, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985). Because forum analysis involves fact-specific concerns, courts have reached divergent conclusions regarding the status of municipal stadiums.[1]

In assessing the historical purpose of the Coliseum, we find the provisions contained within the Nassau County Charter, the instrument by which the Coliseum was established, most persuasive. Section 2206–a(2)(a) provides that the Coliseum may be leased for the "education, enlightenment, cultural development or betterment, ... and ... civic, community and general public interest." Various other provisions indicate the County's objective of fostering civic pride and community identity through the presentation of a variety of events at

---

1. *See,* e.g., *Stewart,* 863 F.2d at 1018–21 (reversing finding that Robert F. Kennedy Memorial Stadium in Washington, D.C. is a nonpublic forum in light of evidence of government intent to permit various expressive activities, and remanding for redetermination of forum status); *Calash v. City of Bridgeport,* 788 F.2d 80 (2d Cir.1986) (Kennedy Stadium in Bridgeport not a limited public forum for *commercial* expression); *Hubbard Broadcasting, Inc. v. Metropoli-* *tan Sports Facilities Commn.,* 797 F.2d 552, 555 (8th Cir.), *cert. denied,* 479 U.S. 986, 107 S.Ct. 576, 93 L.Ed.2d 579 (1986) (expressing doubt that Minneapolis Metro-dome is a public forum by government designation); *Cinevision Corp. v. City of Burbank,* 745 F.2d 560 (9th Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985) (stadium serving as venue for several concerts found to constitute limited public forum).

the arena. *See,* e.g., *Nassau County Charter,* § 2206–a(1) (listing types of activities to occur).

Moreover, Local Law 1, enacted in 1978 by the Nassau County Board of Supervisors, specifically regulates citizen conduct on Coliseum property. Section 4(e)(3) states:

> Except as otherwise provided ... *any person who desires to display, distribute or sell commercial nature* [sic] ... shall obtain the authorization of the director or his designated representative. (emphasis added).

No comparable local law prohibits the distribution of *noncommercial* material.

■ Faced with these strong indicia of Nassau County's intent to dedicate the Coliseum to a broad array of public and expressive uses, appellants urge that the proprietary nature of the current management arrangement renders the forum "nonpublic." They argue that despite the language of the County Charter the Coliseum was built primarily as a commercial venture to generate economic benefits. *See Nassau County Charter* § 2206–a(2)(b) ("improvement of trade and commerce" listed among county goals). Moreover, appellants claim there exists a long-standing policy prohibiting noncommercial leafletting. In support of this position, Facility Management offers employee manuals and various other internal regulations that flatly prohibit all such activity on Coliseum grounds.

It is not Facility Management's gloss on municipal aims, however, that guides our inquiry. It is the intent of the controlling government body which aids our determination. *See Stewart,* 863 F.2d at 1018. This conclusion is reinforced by provisions in the lease between Facility Management and Nassau County which expressly declare that the Coliseum is to be operated in the interests of the County. *See Lease between Nassau County and Facility Management* (preamble).

Moreover, Judge Mishler found that appellants failed to demonstrate a consistent practice of limiting noncommercial, expressive activity. The grounds of the Coliseum have been used for parades, political rallies and speeches, religious weddings and circuses. On five occasions over the past four years, it has been the host to rent-free charitable events. Routinely, banners have been displayed by patrons, including some bearing the inscription "POW's Missing in Action." Significantly, before the installation of current managing personnel in 1988, many groups, including war veterans, the Christian Joy Fellowship and the Salvation Army, were regularly permitted to solicit contributions or distribute literature.

■ Though Facility Management's ban on noncommercial distribution is now being enforced, this is not enough to convert the Coliseum into a nonpublic forum. Objective indicia of intent to create a public forum, combined with a history of consistent practice, can overcome a bare statement of contrary purpose. *See Stewart,* 863 F.2d at 1017. Although the government may seek to impose limitations on the utilization of the situs, "[i]f our public forum jurisprudence is to retain vitality, we must recognize that certain objective characteristics of Government property and its customary use by the public may control the case" *United States v. Kokinda,* —— U.S. ——, 110 S.Ct. 3115, 3125, 111 L.Ed.2d 571 (1990) (Kennedy, J., concurring). Accordingly, appellants' attempt to transform the clearly-established nature of the forum fails.

Finally, we consider the nature of the property and its compatibility with expressive activity. Judge Mishler found the Coliseum compound can comfortably accommodate a wide variety of expressive activities at the same time. As we have stated, the Coliseum contains a large outside area which includes a mall and a network of sidewalks. Its premises are frequently the site of boisterous recreational activity. *See Stewart,* 863 F.2d at 1019. We do not believe appellees' communicative activities at the stadium threaten the same type of basic government functions that are implicated in a post office, *Kokinda, supra,* military bases, *Greer, supra,* or at federal workplaces, *Cornelius, supra.*

In addition, the leaflets in this case are not likely to disturb seriously the audience attending an event in the arena. Because one need not stop nor "ponder the contents of a leaflet in order mechanically to take it out of someone's hand," *Kokinda*, 110 S.Ct. at 3123, the nature of the intrusion is minimal. And, a listener's reaction to speech does not control the permissible scope of First Amendment activity. *See United States v. Eichman*, — U.S. ——, 110 S.Ct. 2404, 2410, 110 L.Ed.2d 287 (1990); *Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 2544–45, 105 L.Ed.2d 342 (1989). In short, distributing handbills on the plaza and sidewalks is not likely, as appellants argue, to interfere with the mood or the quality of the Coliseum arena events which have included performances by diversified entertainment such as the New York Islanders, Bruce Springsteen, Motley Crue, R.E.M. and the TNT Monster Truck Challenge.

Moreover, crowd control, safety and sanitation interests do not mandate a different result. Though appellants raise legitimate concerns that unrestrained leafletting may pose substantial safety hazards, they have in the past permitted the distribution of advertisements related to Coliseum events. We take this as a strong indication that, for the right price, the dangers asserted are not unduly grave. Furthermore, potential littering problems have been addressed by submitting cleanup bills to responsible parties. In any event, the court's order provides that reasonable restrictions may be imposed, thereby alleviating difficulties which the appellants foresee by affording First Amendment protection to the appellees.

We conclude that Judge Mishler did not abuse his discretion in classifying the Coliseum as a public forum by government designation. Accordingly, in the circumstances here, a complete ban on communicative activity constitutes an impermissible abridgement on expression. *See Perry*, 460 U.S. at 45, 103 S.Ct. at 954; *Widmar v.*

*Vincent*, 454 U.S. 263, 267–68, 102 S.Ct. 269, 273–74, 70 L.Ed.2d 440 (1981).[2]

### Conclusion

In many cities and suburban environs like Long Island, the municipal stadium has replaced the town meeting hall and the public square as a gathering place for large segments of the population to engage in meaningful discourse. If free public discussion is to maintain its vitality in our national life, we must remain vigilant against unnecessary restraints on our liberties, particularly those arbitrarily imposed by government fiat.

Accordingly, for the reasons we have set forth, the judgment of the district court awarding preliminary injunctive relief is affirmed.

---

**2.** In light of our disposition, we need not reach the district court's determination that the standardless discretion with which the regulation

has been enforced constitutes an unconstitutional prior restraint.