**UNITED STATES of America, Plaintiff,**

v.

**Amanda Elizabeth FEE, Alexandra Kerr Prime, Stacy Michelle Rosoff, April Edwardine Shea, Chris R. Spaulding, Jill Lynette Sprafke, Gideon Turner, Alison Hilary Walter and Andrew John Zalcberg, Defendants.**

**Civ. A. No. 91–CR–373.**

United States District Court, D. Colorado.

Feb. 28, 1992.

Jerry Cooper, Asst. U.S. Atty., for plaintiff.

Rich Hopkins, Durango, Colo., David Rees, Denver, Colo., Jim Verce, James Grizzard, Jeffrey Deitch, Durango, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

SPARR, District Judge.

THIS MATTER comes before the court on Defendant Stacy Michelle Rosoff's Motion for Judgment of Acquittal, made orally at trial pursuant to Fed.R.Crim.P. 29. This criminal action came before the court for trial to the court on January 6, 1992 and the court took the motion and the determination of guilt under advisement. Defendant Rosoff was the only Defendant tried, as the remaining Defendants have all agreed to dispositions and have waived their right to speedy trial in this matter. The court has now reviewed the entire record in the case, the parties' legal briefs, the evidence and argument presented at trial, and the applicable law and is fully advised in the premises.

### 1. Factual Background

The facts of this case are not significantly disputed. The National Forest Service entered into a contract with Stone Forest Industries, Inc. which allowed Stone to cut trees in a portion of the San Juan National Forest known as the Middle Sandbench Timber Sale area. The Middle Sandbench Timber Sale area has been the subject of public hearings and comment since the original planning stage in approximately 1985. This process included appeal of the Forest Service decision to proceed with the Middle Sandbench Timber Sale as well as both environmental and revised environmental assessments. The timber sale has been the subject of substantial controversy between the Government and environmental interest groups and citizens.

Subsequent to the administrative and political process, cutting was authorized and led to protest activities and arrests in June of 1991. Protests escalated until approximately 75 protestors entered the site of the Middle Sandbench Timber Sale between October 15 and October 20, 1991. The protests grew in intensity, culminating with protestors blocking logging roads, rolling logs from log-loading decks onto the roads, blocking the passage of logging equipment and trucks, surrounding cutters attempting to cut trees, surrounding trees to prevent their cutting, interrupting the work of the loggers, sitting on logging equipment and trucks, and generally blocking the work. Such actions gave rise to concern on the part of National Forest officials that either loggers or protestors could be injured or killed due to falling trees, moving equipment, and the general confusion.

Therefore, Forest Supervisor William T. Sexton issued Special Orders # 91–8 and # 91–18, closing portions of the Middle Sandbench Timber Sale area while logging was taking place. This case arises out of Special Order # 91–18. The purpose of Special Order # 91–18 was "the protection of property, public health and safety from hazards created through the unusual public interest and activity during logging operations within the Middle Sandbench Timber Sale." (Government's Exhibit 2–1). Special Order # 91–18 barred entry into approximately 775 acres of the San Juan National Forest. The San Juan National Forest ranges some 120 miles from east to west, some 60 miles from north to south, and encompasses approximately 1,869,931 acres.

Special Order # 91–18 was implemented under 16 U.S.C. § 551 and the regulatory

scheme enacted pursuant thereto contained at 36 C.F.R. § 261.1, *et seq.*, and was passed pursuant to authority granted to Forest Supervisor Sexton. The order described the road and trail to which it applied, was in effect 24 hours per day between October 21, 1991 and January 21, 1992, and specified persons exempted from the order. Pursuant to 36 C.F.R. § 261.51, signs were posted around the perimeter of the timber sale boundary at intervals so that each was clearly visible from the next.

On October 24, 1991, Rosoff and the other nine Defendants deliberately entered the portion of the forest that had been closed by Special Order # 91–18. As they approached the boundary, they stopped and discussed the closure, confirming among themselves that they wished to enter into the closed area knowing that to do so was a violation of the closure order. The Defendants acknowledge that they never requested a permit to enter the closed area. Rosoff and her fellow protestors entered the closed area, formed a circle, locked arms, and sang songs, including "This Land is Your Land," "We Shall Overcome," and "Big Yellow Taxi," to protest the cutting of ancient forests. Forest Service officers asked the group to leave the closed area but received no response. Rosoff and the other Defendants refused to leave the area and were ultimately arrested and removed from the area.

Rosoff was charged with violation of 16 U.S.C. § 551 and its implementing regulations, 36 C.F.R. § 261.53(e) and (f), by entering, on October 24, 1991, an area that was closed to entry pursuant to Special Order # 91–18. Rosoff admits that she willfully trespassed in the areas closed by Special Order # 91–18. But, Rosoff asserts that: (1) Special Order # 91–18 was constitutionally invalid because it allowed unguided discretion to be exercised in determining whether to grant or deny a permit for entry, and (2) her conviction is prohibited because her activities were protected by right to free speech under the First Amendment of the United States Constitution.

## 2. Validity of Special Order # 91–18

First, Rosoff argues that Special Order # 91–18 was unconstitutional and invalid because it allowed unguided discretion to be exercised in determining whether to grant or deny a permit for entry, citing *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), *ACORN v. City of Tulsa*, 835 F.2d 735 (10th Cir.1987), *ACORN v. Municipality of Golden*, 744 F.2d 739 (10th Cir.1984), and *United States v. Christopher*, 700 F.2d 1253 (9th Cir.), *cert. denied*, 461 U.S. 960, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983). Although Rosoff challenges Special Order # 91–18 as invalid as applied to her (Posttrial Brief of Defendant Stacy Rosoff at page 4), her argument must essentially be a facial challenge to Special Order # 91–18. The permit application system was not applied to her because she did not apply for a permit.

Although facial challenges are generally disfavored, they have been permitted in the First Amendment context where the licensing scheme vests unbridled discretion in the decisionmaker. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223, 110 S.Ct. 596, 603, 107 L.Ed.2d 603 (1990). When a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license. *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 755–56, 108 S.Ct. 2138, 2143, 100 L.Ed.2d 771 (1988). Therefore, although Rosoff did not apply for a permit, she has standing to facially challenge Special Order # 91–18.

A regulation can be unconstitutional because it improperly confers upon an administrative official the unbridled discretion to grant or withhold permission based upon broad criteria unrelated to proper regulation. *Shuttlesworth*, 394 U.S. at 156–159, 89 S.Ct. at 941–943, *Christopher*, 700 F.2d at 1260–61. The absence of express standards makes it difficult to distinguish between a licensor's legitimate denial of a permit and its illegitimate abuse of censori-

al power. *City of Lakewood*, 486 U.S. at 758, 108 S.Ct. at 2144.

Although Rosoff argues that the earlier closure order, Special Order #91–8, was improperly applied with unguided discretion, Rosoff was charged with violating the later Special Order #91–18. The court will limit its inquiry to the validity of Special Order #91–18.

Special Order #91–18 was issued pursuant to 36 C.F.R. § 261.50 and § 261.53(e) and (f), which authorize special closures for the protection of public health or safety and property. Special Order #91–18 prohibited entry into approximately 775 acres of a timber sale area in the San Juan National Forest between October 21, 1991 and January 21, 1992. Special Order #91–18 states in pertinent part:

Pursuant to 36 CFR 261.50(a) and (b), the following acts are prohibited on the area and roads described in this order and as shown in Exhibit A within the San Juan National Forest beginning October 21, 1991 through January 21.

1. Entering into or being within fifty (50) yards of the area known as the Middle Sandbench Timber Sale for public health or safety reasons [36 CFR 261.53(e)] and for the protection of property [36 CFR 261.53(f)].

Pursuant to 36 CFR 261.50(e), the following persons are exempt from this order:

1. Persons working within the Middle Sandbench Timber Sale boundaries under Forest Service contract to specifically perform the duties approved by the contract.

2. Persons with a permit specifically authorizing the prohibited act or omission.

3. Any Federal, State, or local officer, or member of an organized fire-fighting force in the performance of an official duty.

The purpose of this order is for the protection of property, public health and safety from hazards created through unusual public interest and activity during logging operations within the Middle Sandbench Timber Sale....

(Government's Exhibit 2–1).

In this case, the permit scheme did not vest unbridled discretion in the decisionmaker. 36 C.F.R. § 251.54(h) sets forth specific standards for the decisionmaker, Mr. Sexton, to apply in determining whether to permit or deny expressive activity. 36 C.F.R. § 251.54(h) provides:

(h) *Response to applications for the distribution of noncommercial printed material or for a group event for the public expression of views.* An authorized officer shall grant an application for authorization of distribution of noncommercial printed material or for a group event for the purposes of public expression of views, unless the officer determines that:

(1) The planned event or use would conflict with another use which has been previously approved by special use authorization, contract, or approved operating plan, under this part or Parts 222, 223, or 228 of this chapter; or

(2) The planned event or use would present a clear and present danger to public health and safety; or

(3) The planned event or use would be of such nature and duration that it could not reasonably be accommodated in the particular place and time applied for, considering such factors as damage to resources or facilities, interference with ongoing resource program activities, or impairment of other public uses authorized for the area; or

(4) The application proposes activities that are prohibited by the rules at Part 261 of this chapter or that violate the provisions of Federal or State criminal law.

(5) There is no person or entity authorized to sign a special use authorization on behalf of the group applying for an authorization and/or there is not person or entity willing to accept responsibility for the group's adherence to the terms and conditions of the permit.

It is apparent that the regulations governing permit application and approval con-

tain explicit limits on the authorized officer's discretion. An authorized officer "shall grant an application ... for a group event for the purposes of public expression of views," unless he/she determines under 36 C.F.R. § 251.54(h) that the activity would, among other things, conflict with another previously approved use, present a danger to public health or safety, interfere with ongoing resource program activities, or impair other authorized public uses for the area. The evidence in this case indicated that Rosoff's expressive activity in the area closed by Special Order # 91–18 would have conflicted with the logging, a special use that was previously authorized by a contract with the Forest Service. Her expressive activity presented a clear and present danger to the health and safety of both protestors and logging personnel. Her expressive activity could not reasonably be accommodated in the closed area when such factors as interference with ongoing resource program activities and impairment of other authorized public uses were considered. The court concludes that there are adequate procedures and standards provided to guide the discretion of Forest Service officials. Because there are objective criteria that ensure that the Forest Supervisor's permit decisions are not based on the content or viewpoint of the expressive activity, Rosoff's facial attack on Special Order # 91–18 must fail.

### 3. First Amendment Protection

Second, Rosoff argues that she cannot be convicted because her activities were protected by her right to free speech under the First Amendment of the United States Constitution.

Rosoff bears the burden of showing that her conduct was expressive and that the First Amendment applies to it. *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 3069 n. 5, 82 L.Ed.2d 221 (1984). The court concludes that her activities would reasonably be understood by the viewer to be communicative and are protected by the First Amendment. *See Clark,* 468 U.S. at 294, 104 S.Ct. at 3069; *Spence v. State of Washington,* 418 U.S. 405, 409–10, 94 S.Ct.

2727, 2729–30, 41 L.Ed.2d 842 (1974); *Tinker v. Des Moines School District,* 393 U.S. 503, 505–06, 89 S.Ct. 733, 735–36, 21 L.Ed.2d 731 (1969).

The government, no less than a private property owner, has the power to preserve the property under its control for the use to which it is lawfully dedicated. *Adderley v. Florida,* 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966), *reh'g denied,* 385 U.S. 1020, 87 S.Ct. 698, 17 L.Ed.2d 559 (1967). "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,* 473 U.S. 788, 799–800, 105 S.Ct. 3439, 3447–48, 87 L.Ed.2d 567 (1985). People who want to protest or express views do not have a constitutional right to do so whenever, however and wherever they please. *Adderley,* 385 U.S. at 47–48, 87 S.Ct. at 247–48.

### a. Forum Analysis

Recognizing these principles, the Supreme Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to certain intended purposes outweighs the interest of those wishing to use the property for other purposes. *Cornelius,* 473 U.S. at 800, 105 S.Ct. at 3447. The extent to which the Government can control access depends on the nature of the relevant forum. *United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 3119, 111 L.Ed.2d 571 (1990); *Cornelius,* 473 U.S. at 800, 105 S.Ct. at 3447.

In defining the forum, the Supreme Court has focused on the access sought by the speaker. When speakers seek general access to public property, the forum encompasses that property. In cases in which limited access is sought, the Court has taken a more tailored approach to ascertaining the perimeters of a forum within the con-

fines of the government property. *Cornelius,* 473 U.S. at 801, 105 S.Ct. at 3448. Rosoff sought access to the 775-acre closed area known as the Middle Sandbench Timber Sale in the San Juan National Forest.

Having identified the forum as the closed 775 acres of the San Juan National Forest known as the Middle Sandbench Timber Sale area, the court must decide whether it is nonpublic or public in nature. *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449. Government-owned property has been divided into three categories for purposes of forum analysis: (1) traditional public forums, which by long tradition or by government fiat have been devoted to assembly and debate, including such areas as public streets, parks, and sidewalks; (2) limited public forums, or public forums by government designation that are state-created and opened for limited public use, for example, university meeting facilities and municipal theaters; and (3) nonpublic forums, which, by tradition or design, are not appropriate platforms for unrestrained communication, for example, military installations, school mailboxes, and federal workplaces. *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449; *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 45–46, 103 S.Ct. 948, 954–56, 74 L.Ed.2d 794 (1983); *Paulsen v. County of Nassau,* 925 F.2d 65, 68–69 (2d Cir.1991). Regulation of both public forums and limited public forums is examined under strict scrutiny. Regulation of nonpublic forums where the Government has not dedicated its property to First Amendment activity is examined only for reasonableness. *Kokinda,* 110 S.Ct. at 3119–20; *Perry,* 460 U.S. at 45–46, 103 S.Ct. at 954–56; *United States v. Gilbert,* 920 F.2d 878, 884 (11th Cir. 1991).

### b. Strict Scrutiny of Limited Public Forum

Here, the Government concedes that the Middle Sandbench Timber Sale area is a limited public forum. Rosoff argues that the Middle Sandbench Timber Sale area should be treated as a public forum, citing *United States v. Rainbow Family,* 695

F.Supp. 294, 308–09 (E.D.Tex.1988). The court need not make this determination, however, because whether the timber sale area closed by Special Order # 91–18 is a public forum or a limited public forum, the legal analysis is the same. The court examines the regulation of both public forums and limited public forums under strict scrutiny. *Kokinda,* 110 S.Ct. at 3119–20; *Perry,* 460 U.S. at 45–46, 103 S.Ct. at 954–56; *Gilbert,* 920 F.2d at 884.

■ The Government may regulate expressive activity in a public or a limited public forum by reasonable restrictions as to time, place, and manner, provided the restrictions are justified without reference to the content of the regulated speech, are narrowly tailored to serve substantial government interests, and leave open ample alternative channels of communication. *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 *reh'g. denied,* 492 U.S. 937, 110 S.Ct. 23, 106 L.Ed.2d 636 (1989); *Clark,* 468 U.S. at 293, 104 S.Ct. at 3068. The court concludes that the restrictions on Rosoff's speech activity survive strict scrutiny of these requirements.

### i. Reasonable Restrictions as to Time, Place, and Manner

The validity of time, place, or manner regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests. *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985). The duration of Special Order # 91–18 was 90 days during active logging during an authorized timber sale. Special Order # 91–18 encompassed an area of 775 acres of concentrated logging activity plus a buffer zone out of almost two million acres of the San Juan National Forest. The court concludes that Special Order # 91–18 imposed reasonable restrictions as to time, place, and manner.

### ii. Restrictions Justified Without Reference to the Content of the Regulated Speech

The principal inquiry in determining content neutrality, in speech cases generally

and in time, place, and manner cases in particular, is whether the Government has adopted a regulation of speech because of disagreement with the message it conveys. *Ward,* 109 S.Ct. at 2754. The controlling consideration is the Government's purpose or intent. *Paulsen,* 925 F.2d at 70. A regulation that serves purposes unrelated to the content of the expression is deemed neutral, even if it has an incidental effect on some speakers but not others. *Ward,* 109 S.Ct. at 2754. Government regulation of expressive activity is content-neutral so long as it is justified without reference to the content of the regulated speech. *Clark,* 468 U.S. at 293, 104 S.Ct. at 3068. The requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation. *Albertini,* 472 U.S. at 689, 105 S.Ct. at 2906.

The principal justifications for the closure of the timber sale area were the protection of public health and safety and the protection of property. The evidence indicated that after Special Order # 91–18 was issued, no one was permitted to enter the closed area. The Forest Supervisor did not judge the content of the expressive activities that were restricted. The court concludes that the Government's justifications were unrelated to the content of Rosoff's expression and they satisfy the requirement that time, place, or manner restrictions be content-neutral. The restrictions of Special Order # 91–18 were justified without reference to the content of Rosoff's speech.

### iii. Restrictions Narrowly Tailored to Serve Substantial Government Interests

As the Government points out, Congress has specifically enunciated that one of the purposes for the establishment of the National Forests is to furnish a continuous supply of timber for the use and necessities of citizens of the United States and to develop and administer the renewable resources of the National Forests. 16 U.S.C. § 475, § 529. The National Forest Service had a contract with Stone Forest Indus-

tries, Inc. allowing Stone to cut trees in the Middle Sandbench Timber Sale area. In addition, 36 C.F.R. § 261.50 and § 261.53 authorize National Forest Supervisors to close areas for, among other things, the protection of public health or safety and the protection of property.

Protests prior to the protest at issue in this case had involved extensive on-site activity within close proximity of the logging operations. Previously, protestors had occupied a tree for 12 days, locked themselves to a cattle guard, blocked motor vehicles, rolled logs into the road, surrounded the loggers and the heavy equipment, and sat in front of a tractor. A real need was presented for the protection of public health and safety and for the protection of property. The duration of Special Order # 91–18 was a 90–day period during active logging. Special Order # 91–18 encompassed an area of approximately 775 acres of concentrated logging activity out of almost two million acres of the San Juan National Forest. The activities in this case are distinguishable as more dangerous than those protected in *Spence,* 418 U.S. at 405, 94 S.Ct. at 2728, and *Tinker,* 393 U.S. at 503, 89 S.Ct. at 734, cited by Rosoff in her post-trial brief. The court concludes that the restrictions on Rosoff's speech activity were sufficiently narrowly tailored to serve substantial government interests.

### iv. Restrictions Leave Open Ample Alternative Channels of Communication

Protest activity was not prohibited in the remainder of the San Juan National Forest. In fact, protestors were permitted where the road entered the timber sale area. Rosoff was aware that protest activity was allowed at the location by the road, but she chose to protest in the closed area "where the trees were endangered." The court concludes that adequate alternative channels of communication were left open to Rosoff.

The court having concluded that the Government's restrictions on Rosoff's expressive activities were reasonable as to time, place, and manner, did not refer to the content of her speech, were narrowly

tailored to serve substantial government interests, and left open ample alternative channels of communication, Rosoff's argument that her activities were protected by the First Amendment must fail.

### 4. Conclusion

Accordingly, for the reasons stated in this Memorandum Opinion and Order, Defendant Rosoff's Motion for Judgment of Acquittal is DENIED. Based upon the reasons stated above and Rosoff's admission that she willfully trespassed in the area closed by Special Order # 91–18, the court concludes that Rosoff is GUILTY as charged.

This matter was previously set for sentencing at 1:30 p.m. on March 13, 1992 in Courtroom C–202, United States Courthouse, 1929 Stout Street, Denver, Colorado. Rosoff and her counsel are directed to be present for sentencing. Rosoff's bond is continued to the sentencing date. Judgment of conviction will follow.