Rev. Guy Anthony AUBREY, Plaintiff,

v.

CITY OF CINCINNATI,
et al., Defendants.

No. C–1–91–717.

United States District Court,
S.D. Ohio, W.D.

Feb. 25, 1993.

---

Thomas W Condit, Condit & Dressing, Cincinnati, OH, James J Knicely, Williamsburg, VA, Thomas S Neuberger, Wilmington, DE, for plaintiff.

James Francis McCarthy, III, Stephen Allison Bailey, Lindhorst & Dreidame, Carolyn Ann Taggart, Rendigs, Fry, Kiely & Dennis, Michael Richard Schmidt, Porter, Wright, Morris & Arthur, Cincinnati, OH, for defendants.

## ORDER GRANTING THE PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING THE DEFENDANTS' RESPECTIVE MOTIONS FOR SUMMARY JUDGMENT

SPIEGEL, District Judge.

This matter is before the Court on the following pleadings: the Plaintiff's Motion

for Partial Summary Judgment (doc. 12), the Plaintiff's Memorandum (doc. 13), the Plaintiff's Appendix (doc. 14), the Plaintiff's Addendum (doc. 15), the Plaintiff's Summary (doc. 16), Defendant Cincinnati Reds' ("Reds") Motion for Summary Judgment (doc. 21), Defendant BPS Guards Services, Inc., T/A Burns International Security Services' ("Burns") Motion for Summary Judgment (doc. 22), Defendant City of Cincinnati's ("City") Motion for Summary Judgment (doc. 23), the Plaintiff's Response (doc. 26), Defendant Burns' Response (doc. 27), Defendant City's Summary Response (doc. 28), Defendant Reds' Response (doc. 29), the Plaintiff's Response (doc. 32), Defendant Burns' Response (doc. 33), the Plaintiff's Reply (doc. 34), and the Defendant City's Reply (doc. 37).

## BACKGROUND

This case combines three topics deeply ingrained in the hearts of many Americans— baseball, the Bible, and free speech. On October 17, 1990, the Cincinnati Reds played the Oakland Athletics in Game Two of the World Series. Thousands of fans jammed into Riverfront Stadium[1] ("Riverfront" or "Stadium") to root their rejuvenated Reds on to victory.

One of the fans in attendance was the Plaintiff, Reverend Guy Anthony Aubrey. Mr. Aubrey is an ordained minister whose primary ministry involves Bible teaching, evangelism, and widespread publication of Bible messages at sporting events. Over the last several years, Mr. Aubrey has carried religious signs to nationally televised football, hockey, and basketball games. Mr. Aubrey is particularly concerned with spreading the message contained in John 3:16, which states: "[f]or God loved the world so much that he gave his only Son so that anyone who be-

lieves in him shall not perish but have eternal life."

A game in the World Series is not an ordinary baseball game—it borders on a national event. This is especially true in Cincinnati, the home of professional baseball. As a result of this fanfare, the City employed approximately 47 of its own on-duty police officers to provide additional security at the World Series. In addition, the Reds hired both Burns Security and off-duty Cincinnati police officers to provide additional security.

As part of their duties, the security personnel enforced the various regulations of the Reds. One of the Reds' regulations involves banners that may be hung at Riverfront. The Reds' banner policy does not specifically prohibit religious signs. Instead, under authority granted by the City, the Reds established the following policy:

> [b]allpark patrons are permitted to bring signs and banners to the Stadium. They must be in good taste (as determined by Reds [sic] management) or the banner will be removed.... The only restrictions are the banners cannot interfere with the sight-line of the batter, pitcher or umpire looking down the foul line or in any way that obstructs the view of anyone in the stands. Reds [sic] management reserves the right to remove any banner or sign that is viewed to be in bad taste or is causing an obstruction.

*Deposition of Timothy O'Connell,* attachments to exh. 12. The Reds assert that this written policy has always been understood to mean that all allowable signs must be game-related.[2] The purpose behind the banner policy, according to the Reds, is to preserve an atmosphere of "give me some peanuts and crackerjack, I don't care if I ever go back."[3]

---

1. The City of Cincinnati leases Riverfront Stadium from Hamilton County, Ohio, and then subleases it to the Reds for baseball games. The City and the Reds are actually parties to two subleases, one for the Stadium itself, and the other for the scoreboard.

2. We note that many forms of expression are present at various Reds' games, including a prayer for American soldiers, the national anthem, and advertisements for products.

3. The Director of Operations for the Reds eloquently explained more fully in his deposition:
   Baseball is an entertainment, and it's enjoyed and the whole purpose of baseball is for our fans to come and enjoy nine innings of a sport. Why we are so protective of that atmosphere from any type of signs, not just from religious signs, but also political signs, the conflicts of the day signs, you know, what might be in the newspaper, is that when the purpose—the reason why these people come to this is to get away from the world, to enjoy themselves for

Following Game One of the 1990 World Series, Major League Baseball informed the Reds that they should not allow any banners with a religious content to be displayed in Riverfront. Consequently, the Reds' Director of Operations informed all security personnel that:

> [m]ajor League Baseball is upset with the religious related banners (John 3:13) [sic] that have been appearing in the Stadium.... Please be on the watch for these violations and deal with them accordingly.

*Id.* at exh. 16. Thus, the Reds were determined to prevent the display of religious signs at Riverfront in Game Two of the World Series.

Conversely, Mr. Aubrey arrived at Game Two determined to proselytize his beliefs at the game via a John 3:16 sign. Mr. Aubrey's sign measured approximately two feet by three feet. Mr. Aubrey claims that security personnel grabbed the sign away from him while he was on his way to hang his sign in a permissible location. The Defendants, on the other hand, maintain that Mr. Aubrey was holding up his sign behind home plate when confronted by a security officer. In any event, all parties agree that a Burns' security officer escorted Mr. Aubrey to a police room where three Cincinnati police officers were taking a break. The Burns' security officer and the City police officers explained to Mr. Aubrey that he could not display his sign, because it was not related to baseball. Mr. Aubrey's sign was confiscated until the end of the game, and a Burns' security officer led Mr. Aubrey back to his seat.[4]

Subsequently, Mr. Aubrey brought this lawsuit seeking a declaratory judgment, compensatory and punitive damages, and injunctive relief. In sum, Mr. Aubrey claims that he had a constitutional right to hang his religious sign at Riverfront.

## DISCUSSION

■ Part of the vitality of this country stems from its constitutional guarantee of free speech. Speech, however, is not *absolutely* unrestricted. There are limits. *See e.g., Int'l Soc'y for Krishna Consciousness, Inc. v. New Jersey Sports and Exposition Auth.,* 691 F.2d 155, 162 (3rd Cir.1982) (quoting A. Meklejohn, *Political Freedom* 25 (1965)) ("[w]hen self-governing men demand freedom of speech they are not saying that every individual has an inalienable right to speak whenever, wherever, however he chooses.... Anyone who would irresponsibly interrupt the activities ... [on] a football field ... does not thereby exhibit his freedom. Rather, he shows himself to be a boor, a public nuisance, who must be abated, by force if necessary").

The case before the Court raises a question of free speech on the outer edges of the First Amendment. *Compare Paulsen v. County of Nassau,* 925 F.2d 65 (2nd Cir. 1991) (allowing the distribution of leaflets immediately outside at a county coliseum) *with Hubbard Broadcasting, Inc. v. Metropolitan Sports Facilities Comm'n,* 797 F.2d 552 (8th Cir.) *cert. denied,* 479 U.S. 986, 107 S.Ct. 576, 93 L.Ed.2d 579 (1986) (determining that a constitutional right does not exist to display advertising at a municipally owned sports complex). Past courts have been torn between the principles underlying free speech and the interest of keeping controversial speech out of sporting events.

### Vagueness and Overbreadth

■ A regulation or ordinance may be struck down as overbroad when it delegates excessive discretion in a decision maker to determine whether certain speech is permissible. *Forsyth County v. Nationalist Movement,* — U.S. —, —, 112 S.Ct. 2395, 2401, 120 L.Ed.2d 101 (1992). As a result, a party has standing to challenge a regulation on its face under the overbreadth doctrine where application of the regulation creates an impermissible risk of suppressed speech, even though the application of the regulation in the case under consideration is constitutionally permissible. *Id.* However, a regulation may be invalidated on its face only if the

---

two or three hours or more, closer to four hours, and enjoy the sport. We feel the baseball field is not a forum for the problems of today or the issues of today.

*O'Connell Deposition,* at 58.

4. It is factually unclear which security officer actually confiscated Mr. Aubrey's sign.

overbreadth of the regulation is substantial. *Houston v. Hill,* 482 U.S. 451, 458–59, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1986).

■ The policy underlying standing under the overbreadth doctrine is to avoid "chill[ing] the expressive activity of others not before the court." *Forsyth County,* —— U.S. at ——, 112 S.Ct. at 2401; *see also City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 755–69, 108 S.Ct. 2138, 2142–50, 100 L.Ed.2d 771 (1988) (same principle). In the case before this Court, Mr. Aubrey has third party standing to challenge the facial validity of the Reds' banner policy on behalf of others, because his banner was confiscated. *See id.* Consequently, Mr. Aubrey has standing regardless of whether the Defendants actually violated Mr. Aubrey's First Amendment rights.

The United States Supreme Court recently considered a similar case in *Board of Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987). In that case, officials at the Los Angeles International Airport attempted to ban all speech in the airport terminal except expressive activity related to the purposes of the airport. The *Jews for Jesus* court struck down the regulation as overbroad without reaching the question of whether the airport was a public or nonpublic forum. The court reasoned that the airport's regulation was subject to multiple, contradictory interpretations. Thus, the court concluded that the regulation was unconstitutional because it conferred upon airport officials virtually unfettered discretion in determining which speech was permissible. *Id.* at 576, 107 S.Ct. at 2573.

Another district court applied the holding in *Jews for Jesus* in a case factually analogous to the one at bar. In *Stewart v. Dist. of Columbia Armory Bd.,* 789 F.Supp. 402 (D.D.C.1992), the plaintiffs sought a temporary restraining order to enjoin the operators of RFK Stadium in Washington, D.C. from banning religious signs. RFK Stadium required all banners to "pertain to the event." *Id.* at 403. In considering the plaintiffs' likelihood of success on the merits, the *Stewart* court concluded that the plaintiffs had a substantial likelihood of demonstrating that the regulation was overbroad and vague. *Id.* at 406.

■ Keeping in mind this case law, we turn now to the case before this Court. The Reds' banner policy permits fans to hang signs in Riverfront only if they are in "good taste." What is good taste? It is not defined in the banner policy. The Reds assert that good taste means "baseball-related." However, not even Reds' employees can agree upon what constitutes good taste as they have informally defined it.

Some examples illustrate the inherent arbitrariness of trying to determine whether a banner is in good taste. The sign "God loves the Cincinnati Reds" would be acceptable to the Reds' Director of Operations, but perhaps would not be acceptable to the security personnel enforcing the banner policy. *Compare O'Connell Deposition,* at 80 *with Deposition of Orion A. Rutherford,* at 23, 25. The Director of Operations thought that "Go Reds, John 3:16" was in bad taste, while "Go Reds and get well Dave McCoy" was permissible, even though Dave McCoy is not a baseball player. *O'Connell Deposition,* at 81, 122–23. Finally, the Reds determined that signs favoring the use of military force against Iraq were in good taste, and thus were permissible during the 1990 World Series games, even though such signs had nothing to do with baseball.

In light of these examples and this Court's experience, we have no hesitancy in concluding that the Reds' banner policy of good taste is substantially overbroad and vague on its face. The Reds' policy leaves too much discretion in the decision maker without any standards for that decision maker to base his or her determination. As the Supreme Court concluded in *Jews for Jesus,* " 'the opportunity for abuse, especially where a statute has received a virtually open-ended interpretation, is self-evident.' " *Id.* 482 U.S. at 576, 107 S.Ct. at 2573 (quoting *Lewis v. City of New Orleans,* 415 U.S. 130, 135–36, 94 S.Ct. 970, 974, 39 L.Ed.2d 214 (1974) (Powell, M., concurring)).

### Responsible Parties

The City argues that it should be dismissed from the case, because in the City's

lease with the Reds, the Reds have the right to control the stadium during baseball games. The City further notes that neither City Council nor the City Manager has ever adopted or promulgated a rule, regulation, or policy prohibiting the display of a banner during a Reds' game. *See Monell v. Dept. of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978) (holding that a municipality may only be held liable under § 1983 for a policy, practice, or custom).

Mr. Aubrey contends that the City's policy can be pieced together from various documents and the actions of City officials. The lease of Riverfront to the Reds reserves certain rights to the City, including the following: (1) the right of the City to use or sublet Riverfront during periods when the Reds are not using the Stadium; (2) the right of the City to station uniformed police in and around Riverfront at any and all times; and (3) the power of the City to set rules and regulations concerning the use and occupancy of the Stadium. While the City has exercised its rights with regard to subletting Riverfront to other parties and stationing uniformed police, the City has never asserted its authority to establish rules and regulations at Riverfront pertaining to speech for Reds' games. Instead, the City has allowed the Reds to promulgate their own rules.

■ Turning to the law in this area, a municipality may only be sued for monetary damages under § 1983 when the municipality has followed a rule, policy, or custom that deprives a person of his or her constitutional rights. *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037. Thus, a municipality's liability is limited to those acts which a municipality has officially sanctioned, ordered, or followed. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479–80, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986); *see also Oklahoma City v. Tuttle,* 471 U.S. 808, 820, 105 S.Ct. 2427, 2434, 85 L.Ed.2d 791 (1985) (quoting *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981)) (municipal policy must

be the "moving force of the constitutional violation"). Moreover, § 1983 liability applies "where—and only where—a *deliberate choice* to follow a course of action is made from among various alternatives by the official or officials responsible for establishing the final policy with respect to the *subject matter in question.*" *Pembaur,* 475 U.S. at 483, 106 S.Ct. at 1300 (emphasis added).

■ The subject matter in question in the case at bar is the banner policy at Riverfront Stadium. At first glance, none of the purported policies of the City cited by the Plaintiff demonstrate a deliberate choice by the City to regulate the display of banners at Riverfront. However, upon further examination, the City officials did make a deliberate choice to support *affirmatively* the Reds' banner policy.

Cincinnati City Council requires any person or organization using Riverfront to obtain a Public Assembly License and a Public Assembly Permit. Cincinnati Mun.Code §§ 881–3, 883–3 (1979). In order to obtain a Public Assembly License or a Public Assembly Permit, the applicant must submit information concerning the operating procedures for the event(s). Among other information, the applicant must include any "[r]ules or regulations ... applicable to patrons ..." and any "[a]rrangements for communication between internal and external security personnel ..." *Id.* at §§ 881–3(b)(3)(f), 881–3(b)(3)(j). Under Cincinnati law, the City's Safety Director must review the submissions and decide whether to issue the Public Assembly License and Public Assembly Permit.[5]

In complying with these City laws, the Reds submitted to the Director of Safety their plans for the 1990 baseball season. As part of this information, the Reds presented their security plan, which coordinated the use of Reds' security officers, Burns' security officers, and Cincinnati Police Officers. All security personnel were under a senior City

---

5. Thus, the City Council has delegated to the Director of Safety the authority to make policy decisions. *See Pembaur,* 475 U.S. at 481, 106 S.Ct. at 1299 (1986) ("[i]f the decision to adopt ... [a] particular course of action is properly

made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood").

Police Sergeant who wore "two hats," one as a uniformed City police officer and the other as the privately-compensated Security Coordinator for the Reds. The Director of Safety approved the Reds' 1990 plan and issued the Public Assembly License and Public Assembly Permit.[6]

While the over-arching purpose of having Cincinnati Police Officers present at Reds' games has been to provide public protection, the City has also chosen to enforce the Reds' rules and regulations through its police force. Sergeant Howard Whitson, who serves jointly as a City Police Sergeant and the Reds' Security Coordinator, stated in his deposition:

> Q. And during the 1990 World Series, is it true that the World Series Detail that was within the stadium was acting to enforce the security regulations of the Reds?
> A. Yes.

*Deposition of Howard Whitson,* at 31. Therefore, Sergeant Whitson stated that he would forbid a fan from displaying a "John 3:16" in Riverfront according to the Reds' banner policy. *Id.* at 36. In fact, when a Burns' security officer escorted Mr. Aubrey to the police room, both on-duty Cincinnati police officers on break and Burns' security personnel explained to Mr. Aubrey that he could not display his religious sign under the Stadium rules. *Deposition of Clarence Satterfield,* at 16 ("And I [on-duty police officer Clarence Satterfield] tried to explain to him [Mr. Aubrey] that that evidently was the policy that he couldn't have a sign like that"); *Deposition of David Huesman,* at 22–24. Thus, we conclude that the City had an affirmative policy of allowing on-duty and off-duty police officers to enforce Reds' regulations, which included the unconstitutional requirement that all banners be in good taste.

For the City to be held liable, however, Mr. Aubrey must also demonstrate an affirmative link between the municipal policy and the alleged denial of his constitutional rights. *See Oklahoma City,* 471 U.S. at 823, 105 S.Ct. at 2436 (1985). Mr. Aubrey has shown that the City made an affirmative decision to support the Reds' regulations through the City's police force. As a result, on-duty and off-duty police officers were patrolling Riverfront during Game Two of the 1990 World Series. In fact, City police officers spoke with Mr. Aubrey in the police room and explained to him that he could not display his sign under Reds' regulations. Therefore, we conclude that the City's policy to enforce the Reds' banner policy is affirmatively linked to the alleged denial of Mr. Aubrey's constitutional rights.

As far as the Reds and Burns are concerned, they are also not dismissed from this case. The Reds established the banner policy in question. Burns enforced it. *See Dennis v. Sparks,* 449 U.S. 24, 27–28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980) ("[p]rivate persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions"). Consequently, they, too, must remain a part of this action.

## CONCLUSION

This Court is making a limited decision today. We are not determining whether Riverfront is a public or nonpublic forum. We are not holding that Mr. Aubrey has a constitutional right to hang religious banners at Riverfront Stadium. We are not holding that the Defendants may not limit speech during a baseball game. We are not deciding whether Mr. Aubrey may recover damages. Nevertheless, we are holding that the Reds' banner policy, as written, is substantially vague and overbroad.

Accordingly, the Plaintiff's Motion for Partial Summary Judgment is granted with regard to the Reds' banner policy. The City's, the Reds', and Burns' respective Motions for Summary Judgment are denied.

SO ORDERED.

---

6. In addition, off-duty Cincinnati police served as additional security personnel for Reds' games. As required by the Cincinnati Police Procedure Manual, the Police Chief gave written approval for off-duty police to assist the Reds. Plaintiff's Appendix, doc. 14, at 222.