Zalaski v. City of Bridgeport

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Argued: June 26, 2009                                    Decided: July 27, 2010)

Docket No. 08-3671-cv

_____

LISA ZALASKI,

*Plaintiff-Appellant,*

and

FRIENDS OF ANIMALS, INC.,

*Plaintiff,*

-v-

CITY OF BRIDGEPORT POLICE DEPARTMENT and
DEPUTY CHIEF JAMES A. HONIS,

*Defendants-Appellees.*

_____

McLAUGHLIN, POOLER and WESLEY, *Circuit Judges.*

Plaintiff-appellant Lisa Zalaski appeals from the judgment, dated June 23, 2008, of the United States District Court for the District of Connecticut (Bryant, *J.*), granting the defendant-appellees' motion for summary judgment and dismissing the complaint. Because we believe that the district court's opinion granting summary judgment sets forth insufficient grounds for the dismissal of Zalaski's claims under the First Amendment to the United States Constitution, we VACATE the judgment and REMAND for further proceedings consistent with this opinion. Judge Wesley dissents in a separate opinion.

_____

DEREK V. OATIS, Lobo & Novick, LLP, Manchester, CT,

*for Plaintiff-Appellant.*

BETSY A. EDWARDS, Office of the City Attorney (John R. Mitola, *on the brief*), Bridgeport, CT, *for Defendants-Appellees.*

**PER CURIAM:**

This case presents a conflict between an individual's assertion of her First Amendment right to engage in public protest and the official responsibility to maintain public safety and order. We emphasize at the outset that we take no position in this opinion as to the merits of the First Amendment claim at issue here. We believe, however, that the spartan analysis conducted by the district court falls short of that required by First Amendment jurisprudence. We therefore conclude that the case should be remanded to the district court so that a more comprehensive inquiry might be conducted.

## FACTS

The complaint in this action was filed on October 27, 2006, in the United States District Court for the District of Connecticut. Lisa Zalaski, a citizen of Connecticut, names as defendants the City of Bridgeport Police Department ("the City") and its Deputy Chief of Police, James Honis.[1] Zalaski's claims arise from her participation in protests in support of animal rights taking place outside of the Arena at Harbor Yard ("the Arena"), a 10, 000-seat performance venue which typically hosts between 130 and 150 events a year. The Arena is owned by the City of Bridgeport and managed by a private enterprise called "Centerplate." Centerplate manages the Arena pursuant to the terms of an operating agreement, a copy of which is not contained in the

---

[1] Zalaski's co-plaintiff, Friends of Animals, Inc., withdrew from the case on some unspecified date prior to the district court's grant of summary judgment.

record on this appeal.

The protest demonstrations at issue took place in an area in front of the Arena known as "the Plaza," which the defendants describe as "a large, semi-circular, paved area" through which patrons must walk in order to reach the Arena's entrances and attend performances held inside. Zalaski alleges, and the defendants do not dispute, that since the Arena was opened, in 2001, annual protests in support of animal rights have been held in the Plaza during the appearance at the Arena of Ringling Brothers and Barnum and Bailey Circus ("the Circus"). Specifically, Zalaski states that these protests "sought to engage patrons of these performances in civil discussion in order to dissuade them from further attendance and support of these performances until the use and confinement of non-human animals by the Circus ceased."

Prior to 2006, according to Zalaski, animal rights protestors applied for and received permits from the City to demonstrate in the Plaza during Circus performances, and none of these demonstrations resulted in "arrest, infractions, or imposition of any criminal charges or activities." On October 10, 2006, Zalaski was part of a group of demonstrators who successfully applied to the City for a permit to hold a demonstration at the Circus's performances scheduled for later in the month. She alleges that the group "intended, through the use of oral communication, leafleting, signs and placards, . . . to express their opposition" to the removal of "non-human animals, including elephants, from the wild, denying them the ability to engage in normal activities and social interactions, confining them and maintaining them in captivity, all for the purpose of providing 'entertainment.'"

On October 25, 2006, Zalaski and other demonstrators arrived at the Plaza, situating themselves about 30-40 feet from the entrances to the Arena. Zalaski alleges, however, that the

3

demonstrators were confronted by Honis and other City police officers and "physically pushed to an area approximately 100 feet from the entrance to the Arena." At this distance, it is alleged, the group "could not engage patrons in normal conversation, distribute literature, [or] have their signs read." Shortly thereafter, "a number of individuals, all standing approximately 100 feet from the entrance to the Arena in a location verbally designated by various police officers, were arrested." According to an official police report, nine individuals were arrested and charged with breach of the peace, interfering with police officers, criminal trespass, and inciting to riot. It appears from the record that these charges were resolved by guilty pleas and the imposition upon each demonstrator of a $35 fine, plus costs. According to her affidavit, Zalaski herself was not arrested because she, along with two other demonstrators, purchased a ticket to see the Circus and was thereafter allowed to demonstrate "within five feet of the . . . front of [the Arena] for approximately an hour."

As noted above, the complaint was filed two days after the October 25, 2006 demonstration. The complaint asserts claims under the First Amendment to the United States Constitution via 42 U.S.C. § 1983, and seeks declaratory and injunctive relief, as well as compensatory damages.[2] On the day the complaint was filed, after holding a hearing, U.S. District Judge Janet C. Hall granted a temporary restraining order, the precise terms of which are not clear from the record. *See Friends of Animals, Inc. v. City of Bridgeport Police Dep't et al*,

---

[2] Section 1983 is the statutory means by which plaintiffs may seek relief for violations of their constitutional rights. Specifically, the statute allows an individual to bring suit upon a claim that she has been "depriv[ed] of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. There is no dispute in this case that the alleged deprivation of Zalaski's First Amendment rights meets the statutory requirement of having taken place "under color of" state law.

4

No. 3:06-cv-1708, 2007 WL 201245, at *2 (D. Conn. Jan. 23, 2007). Three months later, Judge

Hall denied the City's motion to dismiss the complaint for failure to name a necessary party, i.e.,

Centerplate, the private firm which manages the Arena. *Id.* at *4.

In anticipation of the Circus's performances at the Arena in October 2007, Zalaski sought

a renewal of the temporary restraining order. This renewal was denied by U.S. District Judge

Vanessa L. Bryant, to whom the case had been transferred. Judge Bryant specifically considered

the following "request" by the City: "At the present time, the defendants have requested that the

plaintiffs demonstrate on the plaza no closer than 80 feet from the two main entrances to the

arena." *Friends of Animals, Inc. v. City of Bridgeport Police Dep't et al*, 2007 WL 3124872, at

*1 (D. Conn. Oct. 25, 2007). Judge Bryant continued by holding that the Plaza was not a

"traditional public forum," which would require the highest level of scrutiny of any government

restriction of First Amendment activity taking place therein:

> On the basis of the evidence presented by the parties, the Court
> finds that the plaza, which has been in existence only since 2001,
> has not been devoted to assembly and debate. The evidence
> indicates that the plaza is used primarily by patrons of the arena for
> the purpose of entering and exiting the facility before and after
> performances inside. In other words, people ordinarily would not
> visit the plaza unless they intended to enter the arena to view a
> performance inside. The plaza is consequently not a public forum.

*Id.* at *2 (internal citation and quotation omitted).

Judge Bryant assumed *arguendo* that the Plaza was a "limited public forum," because

"[s]ince the arena opened in 2001, the city and arena management have allowed the plaintiffs to

demonstrate on the plaza." *Id.* She added, however, that she "reserve[d] final determination of

whether that permissive use of the plaza renders it a limited public forum," until the filing of

5

dispositive motions. *Id.* Judge Bryant proceeded to hold that "the 80-foot restriction" was a permissible restriction upon the plaintiffs' First Amendment activity:

> The restriction is content neutral because it applies to all demonstrators at the circus regardless of subject matter and viewpoint. The restriction serves a significant government interest, namely, security and orderly crowd movement, and the restriction is narrowly tailored to serve that interest because it does not burden substantially more speech than is necessary. . . . [T]he defendants' exhibit 1, which is a DVD of a portion of the demonstration in 2001, includes images of demonstrators standing more than 80 feet away from the arena, and those demonstrators could still be seen and heard by patrons heading to the arena. The Court consequently concludes that the 80-foot restriction leaves an ample alternative channel of communication available to the plaintiffs.

*Id.* at *3.

In a brief order, dated June 20, 2008, Judge Bryant granted the defendants' motion for summary judgment. The order reads, in full, as follows:

> ORDER granting defendants' Motion for Summary Judgment against the only remaining defendant [sic], Zalaski. The Court previously issued an opinion, in which it determined that the plaza in front of the arena is not a public forum, and Zalaski has not presented any further evidence suggesting that the plaza could be a public forum. Consistent with [its previously issued opinion], the Court assumes for the purposes of the present motion that the plaza is a limited public forum because the city and the arena management have allowed Zalaski to demonstrate there. The 80-foot restriction previously approved by the Court is content neutral, serves the significant government interest of security and orderly crowd movement, and does not burden substantially more speech than is necessary. The Court does not need to determine whether a greater restriction would also satisfy the applicable test. The complaint arises from demonstrations in the plaza in October 2006, and Zalaski states in her affidavit that she purchased a circus ticket and demonstrated closer to the arena than 80 feet for approximately one hour. Accordingly, there is no genuine issue of material fact as to whether Zalaski's First Amendment rights were violated, and the defendants are entitled to summary judgment. The Clerk is

6

directed to CLOSE this case.

The instant appeal followed.

## ANALYSIS

"We review a grant of summary judgment *de novo*." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). Summary judgment is properly granted when there is no genuine issue of material fact and one party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). All ambiguities must be resolved in favor of the non-moving party and all permissible inferences from the factual record must be drawn in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The moving party bears the burden of establishing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Even though our review is *de novo*, and we are free to decide on any ground apparent from the record, we have in the past remanded for further consideration because the "district court's decision . . . is simply too spare to serve as a basis for our review." *Beckford v. Portuondo*, 234 F.3d 128, 130 (2d Cir. 2000). As we explained in *Beckford*:

> Although we have repeatedly observed, in words or substance, that
> we review a grant of summary judgment de novo applying the
> same standard as the district court," that does not mean that it is
> our function to decide motions for summary judgment in the first
> instance. We are dependent on the district court to identify and sort
> out the issues on such motions, to examine and analyze them, and
> to apply the law to the facts accepted by the court for purposes of
> the motion.

*Id.* (internal quotation and citation omitted). Here, as in *Beckford*, we find the district court's efforts are "simply too spare to serve as a basis for our review." *Id.*

This case presents a conflict between an individual's First Amendment right to engage in

7

public protest and a local government's responsibility to maintain public safety and order. As a general matter, "the importance of the First Amendment guarantees to individual development and to our system of representative government" means "that justifiable governmental goals may not be achieved by unduly broad means having an unnecessary impact" upon the rights guaranteed by the First Amendment. *Branzburg v. Hayes*, 408 U.S. 665, 680-81 (1972). At the same time, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981).

It is "clear" that a city has a valid interest in protecting the "safety and convenience" of the patrons of large events held on public property. *Soc'y for Krishna Consciousness,* 452 U.S. at 650. "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 799-800 (1985). That is, "the government is permitted to exercise control over the public's use of government-owned property for expressive purposes, and the degree of control permitted depends upon the nature of the property and the speech restrictions imposed thereon." *Hotel Employees & Rest. Employees Union, Local 100 v. City of New York Dep't of Parks & Rec.*, 311 F.3d 534, 544 (2d Cir. 2002).

Accordingly, the initial task of a court faced with a dispute regarding First Amendment activity on government property is to define the nature of the property at issue. To aid in this task, the Supreme Court has defined various "fora for expression . . . that, correspondingly, fall along a spectrum of constitutional protection," from highest to lowest. *Peck v. Baldwinsville*

8

*Cent. Sch. Dist.*, 426 F.3d 617, 625 (2d Cir. 2005).

In traditional public fora, such as streets and parks, which have "immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions," the government can enact content-based restrictions on speech only if they are necessary to serve a compelling government interest. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (internal quotation marks). Content neutral time, place and manner regulations must be narrowly tailored to serve a significant government interest, and must leave open "ample alternative channels of communication." *Id.*

We apply the same scrutiny to restrictions in a second category of public property, the designated public forum. *Cornelius*, 473 U.S. at 800. A designated public forum exists when the Government acts "intentionally" to create such a space. *Id.* This remains so even though the forum is not one that has been traditionally open to public assembly and debate.

A limited public forum is created when "the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Hotel Employees*, 311 F.3d at 545 (internal quotation marks omitted). In a limited public forum, strict scrutiny does not apply to expressive activities outside the general purpose for which the government opened the forum. *Id.* at 545-46. Restrictions on activities outside the established purpose of the forum need only be reasonable and viewpoint neutral. *Id.* at 546.

Finally, in a nonpublic forum, which has not been opened, by tradition or designation, to the public for communication, speech may be excluded through any "reasonable" content-based restrictions, as long as these limitations do not "suppress expression merely because public

9

officials oppose the speaker's views." *Perry Educ. Ass'n*, 460 U.S. at 46.

In conducting forum analysis, we examine a variety of factors, including "the forum's physical characteristics and the context of the property's use, including its location and purpose." *Hotel Employees*, 311 F.3d at 547. We have held that the "primary factor in determining whether property owned or controlled by the government is a public forum is how the locale is used." *Id.* (citation omitted). Also relevant is the government's intent in constructing the space and its need for controlling expressive activities on the property, as evidenced by its policies or regulations. *See Paulsen v. County of Nassau*, 925 F.2d 65, 69 (2d Cir. 1991). Finally, we consider whether the property in question "is part of a class of property which by history or tradition has been open and used for expressive activity." *Hotel Employees*, 311 F.3d at 547 (internal quotation marks omitted).

Ultimately, forum analysis turns in every case upon a careful study of the property in question in light of these factors, and we are therefore troubled that the district court did not consider any of the leading precedents on forum analysis in cases involving performance venues. In *Paulsen*, for example, we considered restrictions upon the distribution of leaflets outside of Nassau Coliseum, "an enclosed elliptical structure with a capacity of 18,000 seats, [which] is surrounded by a network of sidewalks, pedestrian thoroughfares and numerous parking lots which can accommodate several thousand automobiles." 925 F.2d at 67.

We held in *Paulsen* that the property constituted a traditional public forum because "the Coliseum compound can comfortably accommodate a wide variety of expressive activities at the same time" and was "frequently the site of boisterous recreational activity." *Id.* at 70. We further observed that "[i]n many cities and suburban environs . . . , the municipal stadium has

10

replaced the town meeting hall and the public square as a gathering place for large segments of the population to engage in meaningful discourse." *Id.* at 71.

Application of public forum analysis yielded a different result in *Hotel Employees*, in which we considered whether expressive activity in the Plaza at New York City's Lincoln Center could be limited "to events having an artistic or performance-related component, resulting in a prohibition on political rallies, demonstrations, and leafletting." 311 F.3d at 539. We answered this question in the affirmative, holding that the Plaza was a limited public forum because in constructing Lincoln Center itself, New York City "establish[ed] a cultural center devoted to the performing arts," and had thereby "evidenced an intent to conserve the Plaza's function as an extension of the performing arts complex." *Id.* at 551. The limitation upon the type of expressive activities that could take place in the Plaza was proper, we concluded, because "plazas that serve as forecourts in performing arts complexes are not the types of public spaces that have traditionally been dedicated to expressive uses." *Id.*

In *Hotel Employees*, we identified four factors relevant to the existence of a traditional public forum: 1) "whether the [property] falls within those categories of property historically deemed to be traditional public fora," 2) "whether it is the *type* of property that should be so classified given its physical characteristics, [3)] the objective ways it is used, and [4)] the City's intent in constructing and opening it to the public." 311 F.3d 534, 536-37. Distinguishing *Paulsen*, we observed that "the Plaza is far different from the 'boisterous' grounds of Nassau Coliseum . . . . Instead, the City has created a fountain plaza that serves as the centerpiece of a prominent performing arts complex, and it has sought to preserve the Plaza as an area singularly dedicated to Lincoln Center events and other artistic performances." *Id.* at 555-56.

11

In light of these considerations, we have serious concerns about the forum analysis as apparently conducted by the district court. Especially in light of the sparse record before us on this appeal, we will not attempt to conduct this analysis ourselves. Instead, we remand to the district court which should undertake a comprehensive public forum analysis "so the drastic device of summary judgment is not precipitously imposed." *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 7 (2d Cir. 1983) (citations omitted).

## CONCLUSION

The judgment of the district court is VACATED and this matter is REMANDED to that court for further proceedings consistent with this opinion.

08-3671-cv
Friends of Animals, Inc. (Zalaski) v. Bridgeport

WESLEY, *Circuit Judge*, dissenting:

I do not object to the majority's characterization of the factual background that gave rise to this dispute, nor do I take issue with the majority's characterization of this Court's precedent addressing public forum analysis. I dissent because, in my view, the grant of summary judgment to defendants was proper and no remand is necessary.

Although I agree with the majority that the district court's analysis was spare, Op. at 2, I disagree that this serves as a basis for vacating the judgment of that court. As this Court often notes, and as the majority acknowledges, *see* Op. at 7, "'we may affirm the [d]istrict [c]ourt's order of summary judgment on any ground that finds adequate support in the record.'" *Savin Corp. v. Savin Group*, 391 F.3d 439, 450 (2d Cir. 2004) (quoting *Eichelberg v. Nat'l R.R. Passenger Corp.*, 57 F.3d 1179, 1186 n.6 (2d Cir. 1995)).

The record in this case is closed and there will be nothing new for the district court to consider on remand.[1]

_____

[1] The district court noted that between the time it issued an order denying plaintiff's request for a temporary restraining order and for a preliminary injunction, and the issuance of its order granting summary judgment to

What the majority asks the district court to do is to provide a more detailed explanation of its decision. However, this Court is charged with conducting a *de novo* review of the legal question presented by this appeal. And, because this case presents an important question under the First Amendment, we are obligated to conduct "an independent and searching inquiry of the entire record," *Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 324 (2d Cir. 2006), in order to satisfy ourselves that the grant of summary judgment was proper. *See* Fed. R. Civ. P. 56(c)(2).

There is no dearth of law in our Circuit setting out the factors that should inform a district court's public forum analysis. *E.g.*, *Bronx Household of Faith v. Bd. of Educ.*, 492 F.3d 89, 97 (2d Cir. 2007) (Calabresi, *J.*, concurring); *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir.

---

defendants, "Zalaski [did] not present[] any further evidence suggesting that the plaza could be a public forum." Nor did plaintiff seek further discovery, *see* Fed. R. Civ. P. 56(f), or argue that the district court improperly precluded her from submitting additional evidence. Of course, while the "moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact," when the moving party meets that burden, the nonmoving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (internal quotation marks omitted).

2007) (per curiam); *Huminski v. Corsones*, 396 F.3d 53, 89-92 (2d Cir. 2005); *Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 625-27 (2d Cir. 2005); *Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 544-53 (2d Cir. 2002). In my view, there is nothing to indicate that the district court was unaware of, or misapplied, this line of precedent. Indeed, although the majority characterizes the district court's order as "brief," Op. at 6, and states that it has "serious concerns about the forum analysis as apparently conducted by the district court," Op. at 12, it identifies no error committed by the court below. Of course, "any injury to First Amendment rights is a matter of profound concern to the courts." *Farrell v. Burke*, 449 F.3d 470, 497 (2d Cir. 2006). But, because I conclude that there was in fact no error committed by the district court, I must also necessarily conclude that there was no injury to the plaintiff's First Amendment rights.

The majority cites *Beckford v. Portuondo*, 234 F.3d 128 (2d Cir. 2000) for the propositions that "[t]he district court's decision . . . is simply too spare to serve as a basis for our review" and "that it is [not] our function to

3

decide motions for summary judgment in the first instance." *Id.* at 130. But that case is distinguishable. Here, the district court made specific reference to its previous decision denying plaintiff's motion for a temporary restraining order and for a preliminary injunction. *See* Op. at 6. In that previous opinion, the district court described the property at issue and the challenged restriction on plaintiff's speech, and applied the principles of the public forum doctrine to the facts of this dispute. *See Friends of Animals, Inc. v. City of Bridgeport Police Dep't*, No. 06 Civ. 01708 (VLB), 2007 WL 3124872, at *1-3 (D. Conn. Oct. 25, 2007). In its order granting summary judgment, the district court adopted its previous factual findings and, "[c]onsistent with [its previously issued opinion], the [c]ourt assume[d] for the purposes of [deciding the motion for summary judgment] that the plaza is a limited public forum."

In the district court's decision denying Zalaski's motion for a temporary restraining order and for a preliminary injunction, referenced in its order granting summary judgment, the district court heeded the instructions the majority now provides for it on remand. For example,

4

the majority notes that "the initial task of a court faced with a dispute regarding First Amendment activity on government property is to define the nature of the property at issue." Op. at 8. In its opinion addressing the motion for a temporary restraining order and for a preliminary injunction, the district court noted that, "[i]n considering whether the defendants' request comports with the plaintiffs' rights to free speech and assembly, the [c]ourt first examines the nature of the forum in which the plaintiffs seek to demonstrate." 2007 WL 3124872, at *1 (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983)). After discussing the established categories of public fora, the district court concluded "that the 80-foot restriction [imposed by the City] satisfies the test for a limited public forum." *Id.* at *3.

In her brief to this Court, plaintiff does not argue that the district court misapplied the applicable law. Upon *de novo* "[c]onsideration of the relevant factors, *i.e.*, the [p]laza's location, use, function, and purpose, together with the City's intent in building the space," *Hotel Emps.*, 311 F.3d at 552, I find that evaluating plaintiff's claims in light of the principles applicable to a limited public

5

forum was proper.

This case is further distinguishable from the scenario presented by *Beckford*. In *Beckford* we noted that we were "troubled" by the district court's order because it invoked an "alternate ground," ostensibly advanced by the defendants, but which we could not identify in the defendants' memorandum of law. 234 F.3d at 129. Here, no such error undermines my confidence in the propriety of the district court's order.

The district court's determination that "there is no genuine issue of material fact as to whether Zalaski's First Amendment rights were violated" was proper.[2] The circus was a large event, which required arena personnel and the Bridgeport Police Department to set up wooden sawhorses to form "chutes" in which patrons would line up to pass through security and enter the arena. Sawhorses were also placed between the entrance of each chute in a semi-circular arc, mirroring the front of the arena. Only ticket-holding patrons — including Zalaski herself — were permitted to

_____

[2] Although the majority is "troubled" by the district court's failure to cite to "leading precedents on forum analysis" from this Court, Op. at 10, this omission does not render the district court's order flawed.

6

enter these lines.  Thus, the geographical restriction was not an arbitrary one; rather it was related to legitimate security measures in place at the arena.  *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650-51 (1981).  As the Supreme Court's precedent makes clear, "we simply do not view the question [of] whether the [80]-foot boundary line could be somewhat tighter as a question of constitutional dimension."  *Burson v. Freeman*, 504 U.S. 191, 210 (1992) (internal quotation marks omitted).  Therefore, any disagreement Zalaski may have as to where the barricades were placed does not create a disputed issue of *material* fact.  *See id.*

The record reveals that the plaza at issue is intended to be, and is primarily used as, a means of entry and exit to the arena.  And, while close to a pedestrian sidewalk, it is set off from the public sidewalk by landscaping, grass, and a private drive for patrons of the arena.  Thus, the challenged restriction on where protestors may stand is "reasonable and viewpoint-neutral" and does not violate the First Amendment.  *Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1127 (2009).

I dissent because, in my view, there is no basis for

7

vacating the judgment of the district court when a *de novo* review of the record reveals that the grant of summary judgment was proper. In my view, there is no evidence in the record that would support a different result. *See E.E.O.C. v. J.B. Hunt Transp., Inc.*, 321 F.3d 69, 73-74 (2d Cir. 2003). Accordingly, for the reasons articulated above, I would affirm the judgment of the district court.